[Cite as *In re R.D.*, 2020-Ohio-1456.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| IN RE: R.D. | : | JUDGES: |
|  | : |  |
|  | : | Hon. John W. Wise, P.J. |
|  | : | Hon. Patricia A. Delaney, J. |
|  | : | Hon. Craig R. Baldwin, J. |
|  | : |  |
|  | : | Case No. 2019CA00146 |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | O P I N I O N |

| | |
|---|---|
| CHARACTER OF PROCEEDING: | Appeal from the Stark County Court of Common Pleas, Juvenile Division, Case No. 2018JCV00815 |
| JUDGMENT: | AFFIRMED |
| DATE OF JUDGMENT ENTRY: | April 10,2020 |

APPEARANCES:

For Plaintiff-Appellee:

JAMES B. PHILLIPS
STARK CO. D.J.F.S.
300 Market Ave. N.
Canton, OH 44702

For Defendant-Appellant:

D. COLEMAN BOND
600 Courtyard Ctr.
116 Cleveland Ave. N.W.
Canton, OH 44702

*Delaney, J.*

{¶1}　Appellant S.M. ("Mother") appeals from the August 28, 2019 judgment entry of the Stark County Court of Common Pleas, Juvenile Division, granting custody of her daughter R.D. to appellee Stark County Department of Job and Family Services (the "Agency").

## FACTS AND PROCEDURAL HISTORY

{¶2}　R.D. is the biological child of Mother, who has an extensive history with the Agency and has lost custody of four other children, two through change of legal custody, one through stipulation to permanent custody, and one through involuntary permanent custody.[1]　Throughout her history with the Agency, Mother has started case plan services but has never successfully completed them.

### *Procedural history*

{¶3}　In the instant case, a complaint was filed on August 3, 2018, alleging R.D. is a dependent child.　A shelter-care hearing was held on August 7, 2018; Mother stipulated to a finding of probable cause and R.D. was placed in the temporary custody of the Agency.

{¶4}　On August 29, 2018, a Case Plan Document was filed in the trial court. Mother's case plan required her to be assessed at Phoenix Rising and to follow all recommendations, to take her medications as prescribed, to be assessed at CommQuest and follow all recommendations, and to complete drug tests as requested.

---

[1] Father was a party to the instant permanent custody proceeding but is not a party to this appeal.　Father's parental rights were also terminated in the underlying proceeding.

{¶5}   The matter proceeded to evidentiary hearing on October 17, 2018, and R.D. was found to be a dependent child.  A dispositional hearing was held on October 29, 2018 and R.D. was placed into the temporary custody of the Agency.

{¶6}   On November 29, 2018, an Amended Case Plan document was filed.

{¶7}   On January 29, 2019, a dispositional review hearing was held and status quo was ordered.

{¶8}   On February 25, 2019, the Agency filed an emergency motion to suspend Mother's visitation due to alleged threats by Mother against the Agency and the Guardian Ad Litem (G.A.L.).  Mother threatened that because of "what they've done to her," she would build an arsenal and carry out a mass shooting at the Agency and would "take out" as many people as possible.  Mother also purportedly threatened to make it her "life's mission" to kill the G.A.L. and stated she would happily go to prison for doing so.  The trial court granted the motion to suspend visitation and scheduled the matter for a hearing on March 8, 2019.  Following that hearing, the trial court ordered Mother's visitation suspended until further order of the court.

{¶9}   Mother objected and an evidentiary hearing was scheduled for May 9, 2019. The trial court overruled Mother's objection and approved and adopted the decision of the magistrate.

{¶10} The Agency filed a motion for permanent custody on June 27, 2019, and a hearing was held on August 26, 2019.  Mother requested an extension of temporary custody to allow her to complete case plan services.

*Evidence adduced from permanent-custody hearing*

{¶11} The following evidence was adduced at the permanent-custody hearing and demonstrates Mother's pattern of starting and stopping case plan services, never reaching successful completion.

{¶12} Mother's case plan included an assessment and to follow all counseling recommendations at Phoenix Rising; take medications as prescribed; complete an assessment at CommQuest and follow all recommendations; and complete urine screens and drug testing as requested. Initially, Mother's Phoenix Rising assessment was changed because her needs were outside the scope of the center's treatment options. She was sent to Melymbrosia instead and the case plan was updated. Mother did complete the Melymbrosia assessment and was ordered to attend counseling at Phoenix Rising. Mother sporadically attended Phoenix Rising counseling and missed multiple appointments. She "re-engaged" with Phoenix Rising in June 2019 and attended six sessions in a row, but still missed two appointments.

{¶13} Mother did complete the CommQuest assessment and there were no further recommendations for follow-up.

{¶14} Mother did not comply with random drug screens. Mother obtained a medical marijuana card and was told to provide receipts establishing that the marijuana was obtained legally, but she failed to do so. She did not comply with the social worker's request for receipts. Marijuana use is a new issue for Mother and was not a factor in the removal of four other children. After May 8, 2019, Mother was supposed to continue random urine screens and was requested to drop urine two or three times. Mother failed to comply, once coming in and walking out before the screen was completed.

{¶15} The Agency had concerns with the relationship between Mother and Father. Father was convicted of domestic violence against Mother and there were ongoing complaints of verbal abuse. There were no recent reports of physical abuse. Mother was not forthcoming with the caseworker about whether she and Father were still in a relationship. They did live together at the time of trial. Mother reported on August 13, 2019 that Father had attempted suicide the previous day at her home. When confronted by the worker about whether Father was living with her at the time, Mother claimed Father "just came over" that day.

{¶16} Neither parent has ever successfully completed a case plan. In Mother's past history with the Agency, mental health has always been a concern; Mother has failed to follow through with mental health treatment and medication management. Mother has had domestic violence issues with various paramours, including Father. Mother routinely "starts out strong" and then stops working the case plan; when pressure is on, Mother engages with case plan services, but she soon becomes frustrated and quits. The caseworker testified Mother has kept the same pattern in the instant case.

{¶17} Which is why, the caseworker further testified, that a six-month extension is not warranted in this case and would not be beneficial. Neither parent has demonstrated willingness to engage in case plan services for R.D.'s benefit. Case-plan services were open for a year, but Mother didn't fully re-engage with counseling until the caseworker told her to. Then, she missed two appointments back-to-back. Mother didn't follow through with completing services, refused to prove her marijuana was purchased legally, and failed to comply with drug testing. The case plan was designed to reduce risks posed to R.D., and Mother failed to comply with the recommendations.

{¶18} Regarding visitation, the evidence at the permanent custody trial indicated Mother had not visited the child in over 90 days. Mother's visitation stopped pursuant to court order due to the threats to the Agency and G.A.L. as described supra. At the time of the permanent custody hearing, the order preventing Mother's visitation was still in place.

{¶19} Mother argued that she did attend counseling appointments at Phoenix Rising in May, June, and July. Mother does work and provided pay stubs to the caseworker at one point. Mother argued that her work schedule might affect her counseling attendance, but the caseworker testified Mother works midnights and counseling is during the day. The caseworker acknowledged Mother completed the CommQuest evaluation and had no further recommendations for treatment, and did attend counseling and medication monitoring services at Phoenix Rising, but she has not done random drug screens and has not provided receipts to establish that the marijuana she was known to be using was purchased legally.

{¶20} Mother did report to Melymbrosia for a risk assessment in connection with the threats against the Agency and the G.A.L., but visitation did not resume. Mother was deemed to be impulsive but unable to carry out a plan of violence, therefore not a risk. However, visitation did not resume, which was a matter of contention during the caseworker's cross examination. The Melymbrosia report was only a risk assessment and did not address whether visitation with R.D. should resume, and no motion to resume visitation was filed by either party.

{¶21} Mother's counselor from Phoenix Rising testified she has been a client since August 2018 and that concerns included mood stability, stress reduction, and

coping skills. The counselor described Mother's attendance as "sporadic," although she attended more consistently prior to the permanent custody hearing. The counselor concluded Mother's progress was "minimal" and she did not make a consistent effort to engage with counseling.

{¶22} A psychologist from Melymbrosia testified that Mother does not have any cognitive defects that would prevent her from parenting effectively; she is of average intelligence. He noted, however, that Mother is defensive and presents herself in an overly-favorable light, characteristics which made her evaluation difficult because of inconsistencies between what Mother said and information reported from other sources. For example, Mother stated she was never physically abused, but had disclosed physical abuse to an earlier doctor. Mother claimed she was never in a domestic violence relationship, but had disclosed a great deal of domestic violence to an earlier doctor. There were inconsistencies in Mother's statements about domestic violence with Father; she claimed her own mother had posed as her, reported Father, and made false statements to police. The psychologist opined there was no apparent reason for the discrepancies in Mother's statements, other than to make herself look better. The psychologist testified these discrepancies were concerning because Mother was unwilling to address issues raised in the evaluation and to be accountable. He opined that Mother has personality problems which make parenting difficult, but she does not have a personality disorder. The doctor testified there was no value in requiring Mother to complete a parenting program because she never successfully completed a program in the past.

{¶23} The doctor further noted Mother needs to be willing to ensure that R.D. is adequately cared for; the G.A.L. said that when R.D. was removed from Mother's care, the child had a significant diaper rash which was not present when the infant was out of Mother's care. It was important that Mother cooperate in the counseling process, but she was inconsistent until recently and made minimal progress. Substance abuse was a concern because Father admitted use of methamphetamine, and Mother associated with Father therefore it was important to monitor her potential drug use. Mother has a medical marijuana card, but it was important to ensure no other drugs were used due to Mother's inability to "follow the rules."

{¶24} The psychologist also testified about the risk assessment Mother completed regarding the threats to the Agency and the G.A.L. He does not believe Mother poses a significant risk for violence, but he is concerned about Mother's level of honesty throughout her evaluations, making it difficult to get a sense of what progress she has made during treatment.

{¶25} R.D. is presently in third-party foster placement with a family that would like to adopt her. She is doing very well and is bonded with the family, including half-siblings in the home. She refers to her caregivers as "momma" and "dada." She is a happy baby and is starting to walk; she is up-to-date on immunizations and doctor's appointments. R.D. does have some medical issues which require monitoring; she was born with a sacral dimple, which is a form of spina bifida. She has had some seizure-like activity, including a possible grand mal seizure during which she stopped breathing in the ambulance. R.D. has abnormal heart rhythms; because there was no ultrasound of her heart during prenatal care, she needs an echocardiogram to ensure her heart is functioning properly.

The foster family is dealing with the medical issues appropriately. The foster mother is attentive to R.D.'s needs, the baby is constantly smiling around her, and the home is baby-proofed.

{¶26} The last time Mother visited with R.D. was February 21, 2019. The caseworker testified there is no bond between Mother and the child because they have not seen each other for 6 months.

{¶27} In the caseworker's opinion, it is in the best interests of R.D. for permanent custody to be granted to the Agency because the parents have not worked their case plan services and have not proven R.D. is a priority in their lives. The third-party placement foster parents are the only parents R.D. has ever known, and they want to adopt her.

{¶28} The G.A.L. filed a written report with the trial court recommending that permanent custody is granted to the Agency.

{¶29} On August 28, 2019, the trial court granted the Agency's motion for permanent custody.

{¶30} Mother now appeals from the trial court's judgment entry of August 28, 2019.

{¶31} Mother raises three assignments of error:

**ASSIGNMENTS OF ERROR**

{¶32} "I. THE TRIAL COURT'S DECISION THAT SCDJS MET THE STATUTORY FINDINGS FOR PERMANENT CUSTODY IS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE AND THE TRIAL COURT ERRED BY DENYING AN EXTENSION OF TEMPORARY CUSTODY TO PERMIT THE APPELLANT TO COMPLETE THE REQUIREMENTS OF THE CASE PLAN."

{¶33} "II.   THE WITHHOLDING OF VISITATION BY SCDJS DOES NOT CONSTITUTE ABANDONMENT BY APPELLANT."

{¶34} "III.    THE TRIAL COURT'S DECISION THAT TERMINATION OF PARENTAL RIGHTS WAS IN THE BEST INTEREST OF THE CHILD IS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE AND THE TRIAL COURT ERRED BY DENYING AN EXTENSION OF TEMPORARY CUSTODY TO PERMIT THE APPELLANT TO COMPLETE THE REQUIREMENTS OF THE CASE PLAN."

**ANALYSIS**

I., II., III.

{¶35} Mother's three assignments of error are related and will be considered together.  Mother argues that the trial court's decision granting permanent custody to the Agency is against the manifest weight and sufficiency of the evidence, and that the trial court should have granted an extension of temporary custody to permit her to complete the case plan.  She further argues that she should not be penalized for missing visitation because the Agency sought an order preventing her visitation.  We disagree with each of Mother's arguments and affirm the judgment of the trial court for the following reasons.

{¶36} A trial court's decision to grant permanent custody of a child must be supported by clear and convincing evidence. The Ohio Supreme Court has defined "clear and convincing evidence" as "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty, as required beyond a reasonable doubt, as in criminal cases." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954); *In re: Adoption of*

*Holcomb*, 18 Ohio St.3d 361, 481 N.E.2d 613 (1985). In reviewing whether the trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990); *See also, C.E. Morris Co. v. Foley Constr. Co.,* 54 Ohio St.2d 279, 376 N.E.2d 578 (1978). If the trial court's judgment is "supported by some competent, credible evidence going to all the essential elements of the case," a reviewing court may not reverse that judgment. *Schiebel*, 55 Ohio St.3d at 74.

{¶37} Moreover, "an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusion of law." *Id.* Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained in *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984): The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony. Moreover, deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997); *see, also, In re: Christian*, 4th Dist. Athens No. 04CA10, 2004-Ohio-3146; *In re: C.W.,* 2nd Dist. Montgomery No. 20140, 2004-Ohio-2040.

{¶38} We set forth a trial court's analysis of a permanent custody motion in *In the Matters of: A.R., B.R., W.R.,* 5th Dist. Stark Nos 2018CA00091, 2018CA00097, 2018CA00098, 2019-Ohio-389, paraphrased as follows:

When deciding a motion for permanent custody, a trial court must follow the guidelines for are provided in R.C. 2151.414. R.C. 2151.414(A)(1) requires the trial court to schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

Following a hearing on the motion, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period.

In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) requires the trial court to consider all relevant factors, including, but not limited to: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.

{¶39} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

{¶40} If the child is not abandoned or orphaned, as is the case here, the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.

*Effect of Mother's previous involuntary termination of parental rights*

{¶41} Relevant here, R.C. 2151.414(E)(11) states:

The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

{¶42} In the instant case, Mother does not contest the trial court's finding that she lost four other children, including one to involuntary permanent custody. The burden is shifted to Mother to prove by clear and convincing evidence that, notwithstanding the prior termination, she can provide a legally-secure permanent placement and adequate care for R.D.'s health, welfare, and safety. R.C. 2151.414(E)(11), supra. Mother's argument ignores the trial court's finding and she presents no evidence that she can provide the required elements for R.D.'s care.

{¶43} Instead, Mother argues that she made sufficient progress on her case plan to render the trial court's findings against the manifest weight and sufficiency of the evidence. We note, however, that Mother has an extensive history with the Agency and has demonstrated the same pattern throughout that history: she makes little or no progress on a case plan until pressure is on, but she is unable to prioritize her children

long enough to successfully complete a case plan. In the instant case, the Agency's concerns were untreated mental health, domestic violence, and substance abuse. Father was convicted of domestic violence against Mother but still resides in the home with her, and attempted suicide in the home on August 12, 2019.

{¶44} Mother's case plan included an assessment at Phoenix Rising and follow all recommendations; take medication as prescribed; complete an evaluation at CommQuest; and receive mental health counseling. The case plan was amended to add a Melymbrosia assessment instead of Phoenix Rising. Mother did complete this assessment, which required her to complete random drug screens and weekly counseling at Phoenix Rising. Mother was sporadic in attending counseling, and only began regularly attending once the motion for permanent custody was filed.

{¶45} Mother has not completed a drug screen since May 2019, despite requests from the caseworker. She has tested positive for marijuana but purportedly received a medical marijuana card on May 6, 2019. She was told to provide the caseworker with evidence that she obtained her marijuana legally, pursuant to the medical card, but failed to do so.

*Trial court properly found Mother abandoned the child*

{¶46} Mother's visitation has been suspended since March 8, 2019, pursuant to order of the trial court, and the trial court thereupon found Mother had abandoned the child because there was no visitation in more than ninety days pursuant to R.C. 2151.011(C). Mother argues the suspension of visitation should not be held against her.

{¶47} Similar to the mother's argument in *In Matter of A.R.*, 5th Dist. Stark No. 2018CA00091, 2019-Ohio-389, Mother argues she cannot be held responsible for failure

to visit when visits were prohibited by the Agency pursuant to court order. As we noted in that case, "[Mother's] attempt to absolve herself only further exposes her focus on herself over her children." *Id.,* ¶ 27. In *A.R.,* our decision hinged on the fact that although the mother was prevented from visiting her children, she could have maintained contact by other means, such as telephone calls, letters, or cards. *Id.,* ¶ 28; see also, *In re C.C.,* 12th Dist. Warren Nos. CA2011-11-113, CA20110110127, 2012-Ohio-1291. Mother in the instant case argues that *A.R.* is distinguishable because she had no alternative means of maintaining contact with R.D. because the child is an infant, her contact information was sealed, and Mother followed the court order by completing a Melymbrosia risk assessment. We note, however, that the court order suspending visitation was reviewed twice by the trial court and was necessitated by Mother's actions of threatening the G.A.L. and the Agency.

{¶48} Mother's dilatoriness and inability to tell the truth delayed the assessment and affected its credibility. The Melymbrosia psychologist testified about the risk assessment of Mother; he referred to this evaluation as an "MTI-3" and stated its purpose was to evaluate whether Mother presented a risk for violence. T. 47. It took several months to accomplish this assessment because Mother missed and rescheduled several appointments. While it is true that the psychologist determined Mother is not "particularly a significant risk for violence," it is again true that Mother was not truthful during the evaluation, therefore thwarting efforts of professionals to determine the level of progress she's made on mental health issues. The doctor testified the MTI-3 issue further led him to question how adequately Mother is willing to take accountability and address barriers to effective parenting, much less overcome them.

{¶49} We are therefore unwilling to agree with Mother that she should not be held responsible for the failure to visit with R.D. The relevant Code section describes abandonment as a failure to visit or maintain contact for more than ninety days. R.C. 2151.011(C). We find no error in the trial court's determination that R.D. was abandoned. Although Mother was unable to visit because visitation was suspended, the record indicates that she was dilatory in completing the risk assessment and was not forthcoming when she finally did so. Under these facts, the trial court did not err in determining that R.D. was abandoned. *A.R.*, supra, 2019-Ohio-389 at ¶ 29, citing *C.C.*, supra, 2012-Ohio-1291.

*Extension of temporary custody not warranted*

{¶50} As to Mother's argument regarding the denial of a 6-month extension to permit her to work on the case plan, the decision to grant or deny an extension of temporary custody lies in the discretion of the juvenile court. *In re P.B.*, 9th Dist. Summit No. 23276, 2006-Ohio-5419, ¶ 36, citing R.C. 2151.415(D)(1) and (2). The juvenile court is authorized to exercise its discretion to extend temporary custody only if it finds, by clear and convincing evidence: "'(1) that such an extension is in the best interests of the child, (2) that there has been significant progress on the case plan, and (3) that there is reasonable cause to believe that the child will be reunified with a parent or otherwise permanently placed within the period of extension.'" *In re J.P.-M.*, 9th Dist. Summit Nos. 23694 and 23714, 2007-Ohio-5412, ¶ 12, quoting *In re P.B.* at ¶ 36. Before the juvenile court may grant either permanent custody or a six-month extension of temporary custody, it must conduct a best interest analysis. *In re S.D*, 9th Dist. Lorain Nos. 15CA010864 and 15CA010867, 2016-Ohio-1493, ¶ 30. Accordingly, "[i]f permanent custody was in the

children's best interests, the alternative disposition of extending temporary custody was not." *Id.*, citing *In re I.A.*, 9th Dist. Summit No. 26642, 2013-Ohio-360, ¶ 10.

{¶51} We find appellee presented sufficient competent, credible evidence to demonstrate that R.D. cannot or should not be placed with Mother, as notwithstanding reasonable efforts on behalf of the Agency, Mother failed to remedy the problems that initially caused the removal of R.D. from her home. Mother put minimal effort into her case plan and this was again a case of too little, too late. Mother has not successfully completed her case plan services.  She has had parental rights involuntarily terminated with respect to a sibling of R.D. and the burden therefore shifted to her to prove by clear and convincing evidence that, notwithstanding the prior termination, she can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of R.D.  Mother failed to meet this burden.

{¶52} At the time of the permanent custody hearing, R.D. was a little over one year old and doing very well in the third-party placement.  She is bonded to the family, which includes half-siblings, and the family hopes to adopt her.  They are taking care of her medical needs, which include spina bifida, seizures, and abnormal heart rhythms. R.D. will continue to require medical supervision.

{¶53} Based on the foregoing, the trial court's findings that Mother abandoned R.D. and has proven an inability to demonstrate a commitment to R.D. by failing to complete case plan services are not against the manifest weight of the evidence, and are supported by sufficient evidence. We agree Mother has failed to meet her burden of showing by clear and convincing evidence that the child can safely be returned to her. We further find the trial court's finding that R.D.'s best interests were served by a grant of

permanent custody to the Agency is not against the manifest weight of the evidence and is supported by sufficient evidence. That being true, the trial court also did not abuse its discretion in denying an extension of temporary custody.

**CONCLUSION**

{¶54} Mother's three assignments of error are overruled and the judgment of the Stark County Court of Common Pleas, Juvenile Division is affirmed.

By:  Delaney, J.,

Wise, John, P.J. and

Baldwin, J., concur.